# Exhibit A

STATE OF NORTH CAROLINA

COUNTY OF UNION

IN THE OFFICE OF
ADMINISTRATIVE HEARINGS
22 EDC 01156

| | |
|---|---|
| SF by Parent or Guardian SF & SRF<br>      Petitioner,<br><br>v.<br><br>Union County Board of Education<br>      Respondent. | **FINAL DECISION** |

THIS MATTER came before the undersigned Administrative Law Judge David F. Sutton, on the following dates: July 11-15, 2022, at the Union County Public Schools Professional Development Center in Monroe, North Carolina.

## APPEARANCES

For Petitioners:      Kelli Espaillat
Kincaid and Associates, PLLC
7916 Greylock Ridge Road
Matthews, NC 28105

Carla Marie Fassbender
Fassbender Law, PLLC
1251 Ostwalt Amity Road
Cleveland, NC 27013

For Respondent:      Ashley F. Leonard
Cynthia S. Lopez
Campbell Shatley, PLLC
674 Merrimon Ave., Suite 210
Asheville, NC 28804

## WITNESSES
(in order of appearance)

For Petitioners:
- Jennifer L. Poulsen, EC Program Specialist, UCPS
- Bradley S. Stevenson, Ph.D., Director of Program Administration and Clinical Services, Melmark Carolinas
- James Lambert, Principal, Trinity Prep

- Melissa Todd, Ph.D., Expert Witness, School Psychologist, UCPS
- David Thomson, Assistant Principal, Marvin Ridge High School, UCPS
- Laura Beachum, Ph.D., EC Director, UCPS
- Steven Farmer, Father of S.F.

For Respondent:
- Matthew M. Lasher, Principal, Marvin Ridge High School, UCPS
- Mari McTamney, Assistant Principal, Piedmont High School, UCPS
- Nancy Claudio, Assistant Principal, Marvin Ridge High School
- Wende Toth, Speech Language Pathologist, UCPS
- Laura Beachum, Ph.D., EC Director, UCPS
- Stephanie Welland, Autism Specialist, UCPS

## EXHIBITS

The following exhibits were received into evidence during the course of the hearing. The page numbers referenced in parentheses are the "Bates stamped" numbers.

- Stipulated Exhibits: S5, S7 (pp. 8-9), S12, S15, S22 - S24 (pp. 27-28), S27, S39, S41 (pp. 53-55), S42 (pp. 56-59), S44 (pp. 62-63), S47 (pp. 67-70), S53 (pp. 83-84), S63 (pp. 128-135), S76 (pp. 171-173), S79, S83-S87 (pp. 180-195), S89-S93 (pp. 197-218), S95-S113 (pp. 221-311), S116, S117 (pp. 318-319), S119, S122-S124 (pp. 326-331), S128-S130 (pp. 337-346), S132-S134 (pp. 349-351), S137-S142 (pp. 354-361), S149 (pp. 371-379), S151 (pp. 384-402), S152 (pp. 403-406), S154-S159 (pp. 408-440), S161, S165, S167 (pp. 588-589), S172 (pp. 602-604), S177-S179 (pp. 615-626).

- Petitioners' Non-stipulated Exhibits: P8-P11, P32.

- Respondent's Non-stipulated Exhibit: R6.

## TRANSCRIPT

Transcript Volumes 1, 2, 3, 4 & 5 were received and have been retained in the official record of this case.

## ISSUES

According to the Amended Order on Final Pre-Hearing Conference entered on August 22, 2022 the issues for hearing, as identified by the Petitioners, are as follows:

a) Whether Respondent denied Petitioner S.F. a Free Appropriate Education ("FAPE") during the 2021-22 school year. Some subfactors to consider are:

i. Evaluations

    1. Did the District deny S.F. a FAPE when it did not evaluate S.F. for Speech?

    2. Did the District deny S.F. a FAPE when it did not evaluate S.F. for OT?[1]

    3. Did the District deny S.F. a FAPE when it did not change S.F.'s Behavior Intervention Plan ("BIP") following his change in placement?

    4. Did the District deny S.F. a FAPE when it did not conduct a new Functional Behavior Assessment ("FBA") following the manifestation determination?

    5. Did the District deny S.F. a FAPE when it did not conduct an FBA following multiple behavior incidents in September 2021?

ii. Placement

    1. Did the District deny S.F. a FAPE when it did not allow S.F. to return to his then-current placement following a manifestation determination?

    2. Did the District deny S.F. a FAPE when it changed his placement to homebound instruction?

    3. Did the District deny S.F. a FAPE when it kept his placement homebound beyond the 2-week time period as stated in the October 6, 2022 IEP?

    4. Did the District deny S.F. a FAPE when it failed to provide homebound services for over two weeks following his placement on homebound placement?

    5. Did the District deny S.F. a FAPE when it recommended S.F. remain on homebound placement throughout the remainder of the first semester?

    6. Did the District deny S.F. a FAPE when it failed to consider placement that was less restrictive than homebound as an option after S.F. was not allowed to return to in-person instruction?

    7. Did the District deny S.F. a FAPE when it failed to provide a transition plan that enabled S.F. to access his least restrictive environment?

    8. Did the District deny S.F. a FAPE when it offered a transition plan that required S.F. to spend the entire school day removed from his non-disabled peers?

---

[1] This issue was dismissed pursuant to Respondent's Motion in Limine No. 2 and the Tribunal's July 11, 2022 oral order.

iii. Educational Services

     1. Did the District deny S.F. a FAPE when it reduced his service time on the May 25, 2021 IEP?

     2. Did the District deny S.F. a FAPE when it failed to provide him with IEP accommodations in his general education classes?

     3. Did the District deny S.F. a FAPE when it failed to provide him with related services?

     4. Did the District deny S.F. a FAPE when it denied him ESY services for the summer of 2021 and 2022?

## PROCEDURAL BACKGROUND

1.     On March 28, 2022, Petitioners filed a Petition for a Contested Case Hearing in the Office of Administrative Hearings ("OAH") against the Union County Board of Education (22 EDC 01156) alleging violations of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*. ("IDEA"); N.C. Gen. Stat. §§ 115C-109.6 *et seq*.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"); and Title II of the Americans with Disabilities Act ("ADA").

2.     On April 18, 2022, Respondent filed a Response to the Petition for Contested Case Hearing and moved to dismiss Petitioners' Section 504 and ADA claims.

3.     On April 27, 2022, the Undersigned issued an Order of Partial Dismissal dismissing all of Petitioners' allegations, claims, and causes of action related to Section 504 and the ADA and dismissed all claims for monetary damages.

4.     On April 29, 2022, the Parties engaged in mediation but were unable to reach a resolution.

5.     On May 5, 2022, the Undersigned issued a Scheduling Order setting the hearing in this matter for July 11, 2022 through July 15, 2022.

6.     On June 9, 2022, the Petitioners filed a Motion for Summary Judgment seeking summary judgment in its favor on all issues raised in the Petition.

7.     On June 10, 2022, the Respondent filed a Motion for Partial Summary Judgment seeking dismissal of the Petitioners' private placement reimbursement claim.

8.     On June 28, 2022, the Undersigned issued an Order Denying Petitioner's Motion for Summary Judgment and an Order Granting Respondent's Motion for Partial Summary Judgment.

9. On June 29, 2022, Petitioners filed motions asking the Court to reconsider its ruling granting the Respondent's Partial Motion for Summary Judgment and its ruling in the Amended Scheduling Order regarding the timeline for issuing a final decision in this matter. Respondent filed responses to these motions on July 5, 2022.

10. On July 6, 2022, the Undersigned issued Orders denying Petitioner's Motion to Reconsider Scheduling Order and denying Petitioner's Motion to Reconsider Order Granting Motion for Partial Summary Judgment.

11. On July 8, 2022, the Parties filed a Draft Proposed Order on Final Pre-Hearing Conference setting forth Stipulations agreed to by the Parties.

12. On July 11, 2022, at the start of the hearing in this matter the Undersigned heard arguments on the Respondent's five (5) Motions in Limine. The Judge ruled on the motions in open court as follows:

    a. Motion in Limine number 1 was granted, preventing the introduction of evidence related to matters that occurred prior to March 28, 2021, except to the extent the evidence is introduced for historical purposes only.

    b. Motion in Limine number 2 sought to exclude evidence of claims or causes of action not raised in the Petition. The Undersigned granted the motion excluding evidence of a claim for occupational therapy services and took under advisement claims that S.F. was denied accommodations in his general education classes during the 2021-2022 school year.

    c. Motion in Limine number 3 was withdrawn by Respondent.

    d. Motion in Limine number 4 was granted, excluding evidence related to NCDPI state complaints, subsequent investigation(s), and report(s).

    e. Motion in Limine number 5 related to evidence regarding general education matters. Respondent chose to forego arguing the motion and decided to make objections during the course of the hearing.

13. On July 12, 2022, the Undersigned issued the Order on Pre-Hearing Conference, *nunc pro tunc* July 8, 2022.

14. On July 14, 2022, at the close of the Petitioners' evidence, the Respondent made a Motion for Involuntary Dismissal pursuant to Rule 41(b) of the NC Rules of Civil Procedure. Following oral argument by the Parties, the Undersigned denied the motion.

15. On July 15, 2022, the hearing in this matter ended.

16. On August 22, 2022, Judge Sutton issued an Amended Order on Pre-Hearing Conference, *nunc pro tunc* July 8, 2022, which included a corrected listing of hearing issues as identified by the Petitioners.

17. On August 26, 2022, each Party filed admitted exhibits and verifications.

18.     On August 29, 2022, the Undersigned issued an Order Granting a Joint Motion for Extension of Time, ordering that Proposed Final Decisions are due on or before September 23, 2022 and notifying the Parties that a Final Decision will be served on or before October 21, 2022.

19.     On October 10, 2022, the Undersigned issued an Order Extending Time to File Final Decision to November 7, 2022.

20.     On November 1, 2022, Chief Administrative Law Judge Donald van der Vaart issued an Order Extending Filing of ALJ'S Decision until December 7, 2022.

21.     On November 29, 2022, the Undersigned issued an Order Overruling Objections to Proposed Final Decisions.

## STIPULATIONS

At the start of the hearing in this matter, the Parties agreed to Jurisdictional, Party, Legal and Factual Stipulations in an Order on Final Pre-Hearing Conference, which was approved and filed in the Office of Administrative Hearings on July 12, 2022 and amended on August 22, 2022. The Parties stipulated to, and the Undersigned hereby adopts the following:

### Jurisdiction, Parties and Applicable Law

1.  All Parties are properly before the Court, and the Court has personal jurisdiction over them.

2.  All Parties have been correctly designated.

3.  Petitioner S.F. is domiciled within the boundaries of Union County, North Carolina.

4.  As the party seeking relief, the burden of proof for this action lies with Petitioner. *See Schaffer ex re. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

5.  The Office of Administrative Hearings has jurisdiction to consider this matter pursuant to Chapters 115C, Article 9 and 150B of the North Carolina General Statutes and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* and implementing regulations, 34 C.F.R. Parts 300 and 301, and the N.C. *Policies Governing Services for Children with Disabilities* (Amended March 2021).

6.  The Office of Administrative Hearings does not have jurisdiction over any other original action, including but not limited to, jurisdiction over any claims brought pursuant to Section 504 of the Rehabilitation Act of 1973, Pub. L. 93-112, codified at 29 U.S.C. § 701 *et seq.*

7.  The IDEA is a federal statute governing education of students with disabilities. The federal regulations promulgated under the IDEA are codified at 34 C.F.R. Parts 300 and 301.

8. Respondent Union County Public Schools ("UCPS") is a local education agency receiving monies pursuant to the IDEA.

9. The controlling state law for students with disabilities is N.C. Gen. Stat. Chapter 115C, Article 9.

**Stipulated Facts**

a) S.F. is a sixteen-year-old (16) who attended Marvin Ridge High School ("MRHS") from August of 2020 until December 10, 2021.

b) S.F. initially enrolled in UCPS as a 4th grader in August of 2015. Since enrollment, S.F. has continuously been identified as a student with disabilities and has received services pursuant to an Individualized Education Program ("IEP"). S.F.'s primary area of disability is autism spectrum disorder.

c) While enrolled at UCPS, S.F. has scored Level 5 on all End of Grade ("EOG") examinations.

d) During the 2020-2021 school year, because of the health and safety concerns due to the COVID-19 pandemic, UCPS operated on a hybrid schedule and allowed most students to attend school in-person for two (2) days per week and remotely for the remainder of the week. Students with disabilities were allowed to attend school four (4) days per week. Following spring break in April of 2021, all students were allowed to attend school five (5) days per week.

e) From August 2020 to April 2021, during the 9th grade, S.F. attended school four (4) days per week. Beginning on April 12, 2021, S.F. attended school five (5) days per week for the remainder of the 2020-2021 school year.

f) In the 2020-2021 school year, S.F.'s IEP provided for seventy-five (75) minutes of specially designed instruction in social/emotional skills five (5) times per week and fifteen (15) minutes of specially designed instruction in written expression five (5) times per week. S.F. received his specially designed instruction in the Learning Connections Program at MRHS.

g) In the 2020-2021 school year, S.F. received high school credit for the following courses: English Language Arts/Advanced Inquiry Honors, Earth and Environmental Science Honors, Health and PE, NC Math 2 Honors, Python Programming I Honors, Special Interest Elective, and World History Honors.

h) The Reevaluation Report considered at the May 25, 2021, IEP meeting states "Discipline is not a current area of concern."

7

i) At the annual review of S.F.'s IEP in May 2021, the IEP team reduced S.F.'s EC service delivery time for social/emotional skills from seventy-five (75) minutes to fifteen (15) minutes per day.

j) The IEP developed on May 25, 2021 included three (3) social-emotional goals specifically addressing S.F.'s behavior.

k) S.F.'s May 25, 2021 IEP included a Behavioral Intervention Plan ("BIP") that was developed on May 12, 2020. The BIP provided a "cool down area/safe space" in the school environment as an accommodation for S.F. to use when he was feeling "angry or frustrated" and for "self-regulation."

l) In the 2021-2022 school year, S.F. was promoted to 10th grade and continued to attend MRHS in the Learning Connections program.

m) At the beginning of the 2021-2022 school year, S.F. was absent from school for four (4) days due to COVID protocols.

n) During the 2021-2022 school year, pursuant to his BIP, S.F. was allowed to leave the general education classroom and go to the Learning Connections classroom anytime he was feeling frustrated or angry as a "cool down space."

o) On September 13, 2021, S.F. served a one (1) day suspension from school due to an incident that occurred on September 9.

p) On September 28, 2021, S.F. had a major disciplinary outburst in Civics class that resulted in a six (6) day out-of-school suspension and a recommendation for long term suspension.

q) A manifestation determination review meeting occurred on October 1, 2021, in which the team determined that S.F.'s conduct on September 28, 2021, was a manifestation of his disability.

r) An IEP meeting was held on October 5, 2021, in which the Petitioners and UCPS staff agreed upon a two (2) week temporary homebound placement for S.F.

s) S.F. remained on homebound from October 5, 2021 until his withdrawal from UCPS on December 10, 2021.

t) On December 10, 2021, Petitioners withdrew S.F. from UCPS.

u) S.F. attended Trinity Christian Prep School in-person from December 13, 2021 to February 8, 2022.

v) Following a behavioral incident on February 8, 2022, S.F. was prohibited from attending in-person classes and attended Trinity Christian Prep School virtually.

w) S.F. received five (5) hours of compensatory education for social-emotional skills and one (1) hour of compensatory education for written expression from UCPS provided during February, March, and April of 2022.

x) NCDPI-facilitated IEP meetings occurred on March 31, 2022, and April 12, 2022.

## FINDINGS OF FACT

BASED UPON careful consideration of the sworn testimony of the witnesses presented at the hearing, the exhibits received and admitted into evidence, and the entire record of this proceeding, the Undersigned Administrative Law Judge ("ALJ") makes the following Findings of Fact. In making these Findings of Fact, the ALJ has weighed the evidence presented and has assessed the credibility of the witnesses by taking into account the appropriate factors for determining credibility, including but not limited to the demeanor of the witnesses, any interests, bias, or prejudice the witnesses may have, the opportunity of the witnesses to see, hear, know, and remember the facts or occurrences about which the witnesses testified, whether the testimony of the witnesses is reasonable, and whether the testimony is consistent with other believable evidence in the case and prior actions, including but not limited to verbal statements at IEP meetings as documented in the admitted exhibits, IEP meeting minutes, IEP documents, Prior Written Notices, correspondence and all other competent and admissible evidence.

Unless specifically contradicted, this Decision incorporates and reaffirms all Orders entered in this matter either orally at the hearing or in written format.

Based upon the stipulations of record and the preponderance of admissible evidence, the Undersigned finds as follows:

### S.F.'s Background

1. S.F. began attending UCPS in the 4th grade and has continuously been served as a student with disabilities. (Stip. b).

2. Since enrollment, S.F. has been in five (5) different schools in UCPS. Two of those transitions were because S.F. was promoted from elementary to middle school and middle school to high school. (T. of Father, Tr. Vol. 3, pp. 627-628). A third transition was made when S.F. was in elementary school, and a fourth transition was when S.F. was in middle school. (*Id*.). S.F. has performed well academically and has scored Level 5, the highest level, on all End of Grade examinations. *(Id.*; Stip. c).

3. While in UCPS, S.F. has been served in several different programs for students with autism. (T. of Father, Tr. Vol. 3, pp. 627-628). S.F. began the LC program at Marvin Ridge Middle School in the 2019-2020 school year following a disciplinary incident in the fall of 2019. (*Id.* at p. 547).

### 2020-2021 School Year

4. For the 2020-2021 school year, S.F. attended 9th grade at MRHS and received exceptional children's ("EC") services in the Learning Connections ("LC") classroom. (Stip. f).

5. The LC program serves students who have autism spectrum disorder, who fall within the average to above average IQ range, who need support for social development and have displayed inappropriate verbal and/or physical aggression at school. (Stip. Ex. S165).

6. S.F.'s father ("Father") acknowledged that S.F.'s disability "fit" the criteria for the LC program. (T. of Father, Tr. Vol. 3, p. 648).

7. S.F. had one reported disciplinary incident in the 9th grade in which S.F. received no disciplinary consequence. (T. of Thomson, Vol 3, pp. 498-499; Stip. Ex. S63).

8. During the 9th grade, S.F.'s IEP did not provide for direct speech language services but provided for a support plan in which the speech language therapist monitored fluency strategies and social skills strategies and supported S.F.'s EC and regular education teachers. (T. of Toth, Tr. Vol. 4, pp. 809-810; Resp. Non-stip. Ex. R6).

9. S.F. had a successful 9th grade year at MRHS with no major behavioral issues and performed well academically, earning high school credit in all courses, including many honors courses. (T. of Claudio, Vol. 4, p. 801; Stip. Exs. S63 & S158; Stips. g & h).

10. The IEP Progress Report for the last reporting period of the 2020-2021 school year stated that S.F. met all IEP goals and that "no adjustments need to be made." (T. of Todd, Tr. Vol. 2, pp. 282-283; Stip. Ex. S92).

11. A goal is to always reduce IEP services if data shows a student is successful "under a program." (T. of Poulsen, Tr. Vol. 1, pp. 47-48).

12. A reevaluation that included a review of data, including the speech language services log, input from teachers and input from S.F., was completed at the May 25, 2021 IEP meeting. Following the reevaluation, the team determined that S.F. no longer needed speech language services. (T. of Poulsen, Tr. Vol. 2, pp. 333-334; T. of Toth, Tr. Vol. 4, pp. 810-811; Stip. Ex. S93; Resp. Non-stip. Ex. R6).

13. The Reevaluation Report reviewed at the May 25, 2021 IEP meeting noted that "[d]iscipline is not a current area of concern." (Stip. Ex. S93).

14. The annual review of S.F.'s Individualized Education Program ("IEP") was held on May 25, 2021. At this meeting, the IEP team agreed to reduce S.F.'s EC service delivery time from ninety (90) minutes per day to twenty-five (25) minutes per day and agreed to remove the related service of speech language. (Stip. Exs. S89 & S90).

15. It is appropriate for an IEP team to recommend a reduction in EC services when a student has met all IEP goals, is performing well academically, and has had no major disciplinary issues. (T. of Todd, Tr. Vol. 2, p.287; T. of Poulsen, Tr. Vol. 1, pp. 47-48).

16. At the May 25, 2021 IEP meeting, the team considered Extended School Year ("ESY") services for the summer of 2021 and determined that S.F. was not eligible for ESY services. (Stip. Ex. S89). ESY services must be considered annually but not at every IEP meeting that occurs within the school year. (T. of Beachum, Tr. Vol. 3, p. 681).

17. S.F.'s Parents ("Parents") attended the IEP meeting on May 25, 2021 and were in agreement with the IEP team decision to reduce EC service delivery times, remove speech language services and stated no concerns at the meeting. (T. of Father, Tr. Vol. 3, pp. 641-643; T. of Claudio, Tr. Vol. 4, pp. 798-802; Stip. Ex. S91).

18. S.F.'s Parents did not request a speech language evaluation at the May 25, 2021 IEP meeting. (T. of Father, Tr. Vol. 3, pp. 641-643; Stip. Ex. S91).

19. A Functional Behavioral Assessment ("FBA") and a Behavior Intervention Plan ("BIP") drafted in May of 2020 were in place in May of 2021. (Stip. Exs. S83 & S84).

20. The IEP developed on May 25, 2021, with implementation dates of 5/26/2021 to 5/24/2022, stated that S.F.'s behaviors were addressed by a BIP and behavior goals. (Stip. Ex. S89, p. 4).

21. The May 25, 2021 IEP included three (3) social/emotional goals to address behavior and included an accommodation allowing SF to go to the LC classroom as a "cool down area/safe space" when feeling frustrated or as needed for self-regulation. (Stip. Ex. S89).

**Fall Semester of 2021-2022 School Year**

22. For the 2021-2022 school year, S.F. was in the 10th grade and continued to attend MRHS and receive EC services in the LC classroom. (Stip. l).

23. In the 10th grade, S.F. was enrolled in four (4) courses, including Honors Math and Honors Civics. (Stip. Ex. S161). The 4th block math class was not a large class and had only about 20 students at full capacity. (T. of Thomson, Tr. Vol. 3, p. 500).

24. S.F. was required to miss several days of school because of COVID symptoms. (Stip. m). S.F. struggled to make up classwork missed during his absences. (T. of Father, Tr. Vol. 3, p. 555).

25. As noted in the BIP drafted in May of 2020, a "fast trigger" for S.F.'s behaviors was when he perceived that other students were not as intelligent as he is. (Stip. Ex. S83).

The Parents noted that S.F. does not tolerate "lower intelligence students." (T. of Father, Tr. Vol. 3, p. 645-646; Stip. Ex. S103).

26. Based upon a review of S.F.'s records, large class sizes alone were not a significant trigger for S.F.'s behaviors. (T. of Todd, Tr. Vol. 2, p.303).

27. On September 9, 2021, S.F. had a behavioral incident in his math class in which he called the other students "retards" and threatened to "air out the classroom." (T. of Thomson, Tr. Vol. 3, p. 500). S.F. received one day of out of school suspension as a result of this incident. (*Id.*; Stip. Ex. S63).

28. On September 27, 2021, S.F. had another behavioral incident in his math class in which he called the class "stupid" and then stabbed the wall with his pen. (T. of Thomson, Tr. Vol. 3, p. 501; Stip. Ex. S63). S.F. utilized the strategies and accommodations in his BIP and IEP and left the classroom to go to meet with EC teacher Heather Chizmadia in the LC classroom following this incident. (T. of Thomson, Tr. Vol. 3, p. 501).

29. A major disciplinary incident occurred on September 28, 2021, in the Civics class during a teacher-led class exercise. When the teacher informed S.F. he had gotten an answer wrong, S.F. attacked the teacher and knocked her to the ground. When another student attempted to help the teacher, S.F. attacked the student and then chased the student down the hallway. The other student picked up a chair and threw it at S.F. to defend himself. (T. of Thomson, Tr. Vol. 3, pp. 503-508; Stip. Ex. S63).

30. As S.F. ran through the hallway he yelled, "I'll f****** kill you idiot! Basically murder every f****** black person in the state!" (Stip. Ex. S63).

31. Other students in the hallway captured the incident on their phones and posted the incident on social media. This incident gained a great deal of attention in the MRHS community, and the administration received many calls from concerned parents and others regarding school safety. (T. of Thomson, Tr. Vol. 3, pp. 514-515; T. of Lasher, Tr. Vol. 4, p. 732).

32. The physical aggression displayed on September 28 was not typical behavior for S.F. (T. of Thomson, Tr. Vol. 3, p. 512).

33. As a result of the September 28 incident, S.F. was suspended from school for six (6) days and was recommended for long-term suspension. Because of S.F.'s disability, a manifestation determination review ("MDR") meeting was scheduled. (T. of Thomson, Tr. Vol. 3, p. 509-510; Stips. p & q).

34. The MDR was held on Friday, October 1, 2021. Although there was disagreement among the team members as to whether the incident was caused by S.F.'s disability, the team ultimately decided the conduct was a manifestation of his disability. (T. of Poulsen, Tr. Vol. 2, p. 365; T. of Thomson, Tr. Vol. 3, pp. 516-517; Stip. Ex. S95).

35. In light of the MDR team decision that the September 28, 2021 disciplinary incident was a manifestation of S.F.'s disability, the administration of MRHS was prepared for S.F. to return to his placement at MRHS following his six (6) day suspension. (T. of Thomson, Tr. Vol. 3, p. 517-518; T. of Lasher, Tr. Vol. 4, p. 736).

36. Prior to the incident on September 28, 2021, S.F. had two behavioral incidents of verbal aggression that resulted in a disciplinary consequence of a one (1) day suspension. It is not required to hold an IEP meeting following one or two behavioral incidents. (T. of Father, Tr. Vol. 3, p. 629).

37. S.F.'s BIP dated May 2020 was substantively reviewed and summarized at the October 1 MDR meeting and determined to be appropriate. (T. of Poulsen, Tr. Vol. 2, pp. 362-363; Stip. Ex. S95).

38. The team agreed to meet the following day, on Monday, October 4, 2021 to review S.F.'s IEP. Prior to the meeting, the Parents requested to postpone the meeting. (T. of Poulsen, Vol. 2, pp. 366).

39. The IEP meeting was rescheduled for October 5. (Stip. Ex. S98). The regular education teacher scheduled to attend the October 4 meeting was unable to attend the rescheduled meeting. Assistant Principal David Thomson ("Thomson"), who was licensed as a regular education teacher and knowledgeable of S.F., substituted for the regular education teacher so the meeting could be reconvened quickly. (T. of Poulsen, Tr. Vol. 2, p. 426).

40. To provide continuity, Thomson continued to attend IEP meetings in the Fall of 2021 as the regular education teacher. (T. of Poulsen, Tr. Vol. 2, pp. 425 - 427). Thomson also took the meeting minutes at all of the IEP meetings in the Fall of 2021. The meeting minutes are not a verbatim transcript of the meetings. (T. of Thomson, Tr. Vol. 3, pp. 518 - 519).

41. At the October 5 meeting, the Parents learned a State court Judge had issued a No-Contact Order/Temporary Restraining Order ("Order") against S.F., which prevented S.F. from attending MRHS for ten (10) days. (Stip. Ex. S42). The Order was obtained by the parent of the student who was attacked by S.F. on September 28. MRHS administration did not participate in or advise the parents to seek a restraining order against S.F. (T. of Thomson, Tr. Vol. 3, p. 513).

42. At the October 5, 2021 meeting, the IEP team, including the Parents, agreed to place S.F. on temporary homebound for a two-week period. (Stip. r).

43. At the October 5 meeting, the Parents requested an updated FBA conducted by an autism specialist. The team noted that observations were not available while S.F. was not in a school setting and planned to revisit the issue at the next meeting. (T. of Poulsen, Tr. Vol. 2, pp. 373-374; Stip. Ex. S99).

13

44. At the October 5 meeting, the IEP team considered a longer period of homebound but rejected that option. The team also considered updating the BIP but rejected that option "as the team feels that it requires a further in-depth review and observations not available while [S.F.] is off campus." (T. of Poulsen, Tr. Vol. 2, p. 415; Stip. Ex. S99). The Parents were not in agreement with revising the BIP until an independent autism specialist conducted a new FBA. (T. of Poulsen, Tr. Vol. 2, p. 415-416).

45. At the meeting on October 5, the IEP team amended S.F.'s IEP to provide for 30 minutes of specially designed instruction for social/emotional skills and written expression while on homebound. Modified assignments and extended time were also added as accommodations to S.F.'s IEP. (Stip. Ex. S98 & S99).

46. During homebound S.F. had access to his general education coursework through Canvas, an on-line platform, and email communications with the teachers. S.F. was initially provided a homebound tutor for two (2) hours per week. (Stip. Ex. S98 & S99).

47. Homebound services are not directly proportional to in-school services and are determined by how much EC service a student needs to show growth on their IEP goals. (T. of Poulsen, Tr. Vol. 2, p. 372.)

48. The IEP team agreed to reconvene on October 18, 2021, to discuss "placement and consent to open FBA." (Stip. Ex. S100).

49. EC Program Specialist, Jennifer Poulsen ("Poulsen"), agreed to provide the Parents with options for placement and services ahead of the October 18 meeting. (T. of Poulsen, Vol. 2, pp. 380-382).

50. On October 13, 2021, Poulsen emailed the Parents a document showing the placement options to be considered at the October 18 meeting. The email states "Attached, please find options that the IEP team can use to guide [S.F.'s] educational planning at our IEP meeting next Monday." (Stip. Ex. S122).

51. The following options were emailed to the Parents on October 13, 2021:

| Service Delivery OPTIONS | EC Program Location |
|---|---|
| • Maintain floating access to EC supports alternate location with BIP<br>• Return to existing reg.ed. Schedule with previous amount of services<br>• Add 1:1 adult supervision<br>• add direct EC service in the Special Interest Elective/Learning Connections course curriculum daily for Behavior/Social Skills Goals<br>• on campus, but serve in the EC classroom up to all day through Canvas, UCPS Virtual classes, APEX, access to Covid tutor or ____<br>• on campus, one or two periods in the EC classroom setting, and home setting for the remainder, with supplemental access to teacher/tutor/online instruction depending on the courses chosen<br>• off campus, continue direct homebound services, and increase # of hours (continue to access instruction through current teachers, or switch access to UCPS virtual, APEX, if available. | Learning Connections program<br><br>Marvin Ridge High School<br>or<br>Piedmont High School |
| Same options as above, but EC services would be the BFC setting | Monroe High School --<br>Behavior Focused Classroom |
| Same options as above, but EC services would be through Study Skills/Academic Support setting | Cuthbertson High School --<br>home school by address |

(Stip. Ex. S122).

52. The Parents attempted to postpone the October 18 IEP meeting over an issue not related to S.F.'s current services and homebound placement. (Stip. Ex. S123). Principal Matthew Lasher ("Lasher") addressed the Parents' concerns so the meeting could move forward. (T. of Lasher, Tr. Vol. 4, p. 740; Stip. Ex. S123).

53. At the October 18 IEP meeting, specific programming options were discussed with the Parents; however, the Parents did not agree with any options proposed by UCPS and no agreement was reached regarding returning S.F. to in-person instruction. (T. of Poulsen, Tr. Vol. 2, p. 387 & p. 436; T. of Todd, Tr. Vol. 2, pp. 326-327; T. of Thomson, Tr. Vol. 3, p. 522; T. of Lasher, Tr. Vol. 4, pp. 741-742; Stip. Ex. S103).

54. At the October 18 IEP meeting, the Parents stated that S.F. was in a "fragile state" and that there was "elevated anxiety" when S.F. was in school. (Stip. Ex. S103). S.F.'s Father stated he was "99.9% sure" that S.F. would not return to MRHS and he agreed in the meeting to continue S.F.'s homebound placement. (T. of Father, Tr. Vol. 3, p. 630; Stip. Ex. S103). The Parents stated they did not want to move ahead with placement until "the loose ends are tied up." (*Id.*).

55. At the October 18 IEP meeting, several IEP team members expressed to the Parents their concerns regarding keeping S.F. on homebound. (T. of Poulsen, Tr. Vol. 2, p. 387; Stip. Ex. S103). Lasher noted that a delay in a decision "may not help [S.F.]" and encouraged the Parents to get S.F. placed and "move ahead." (T. of Lasher, Tr. Vol. 4, pp. 741-742).

56. At the October 18 IEP meeting, the team decided S.F. would remain on homebound for four (4) weeks until the end of the grading period. (Stip. Ex. S102). The Parents agreed with the decision to keep S.F. on homebound. (T. of Father, Tr. Vol. 3, p. 630). The meeting minutes would have indicated if the parents were not in agreement with the decision to continue S.F.'s homebound placement. (T. of Thomson, Tr. Vol. 3, p. 523). If the Parents were not in agreement with homebound, the team would have continued to meet until placement was determined. (*Id.*).

57. At the October 18 IEP meeting, the team decided that the school counselor would provide counseling services for 30 minutes once a week. (Stip. Ex. S102).

58. Because of a delay in implementing EC services during homebound, Poulsen sent an email to the Parents communicating a plan to "make them up." (T. of Poulsen, Tr. Vol. 2, p. 425; Stip. Ex. S124).

59. Prior to the next IEP meeting, the Parents emailed Lasher and requested additional tutoring for math services. It took several days to confirm the funding and personnel to provide the additional math tutoring services. (T. of Lasher, Tr. Vol. 4, pp. 745-746; Stip. Ex. S130).

15

60. On November 4, 2021, Thomson informed the Parents the increase in math tutoring services to three (3) hours per week was approved. (T. of Thomson, Tr. Vol. 3, p. 527-529; Stip. Ex. S132).

61. On November 5, 2021, the Father emailed the IEP team and stated the Parents' goal for the upcoming November 8 IEP meeting was to discuss the additional math services that had already been approved. (T. of Lasher, Tr. Vol. 4, pp. 747-748; Stip. Ex. S133). The Parents' main concern at the November 8 IEP meeting was more support for S.F.'s general education, not finding an in-school placement for S.F. (T. of Father, Tr. Vol. 3, pp. 630-631).

62. At the November 8 IEP meeting, the team decided S.F. would continue to receive homebound services until the end of the semester because according to the Parents, S.F.'s anxiety levels were "much lower" when he is not at school. (T. of Todd, Tr. Vol. 2, pp. 321-322; Stip. Ex. S105).

63. At the November 8 IEP meeting, the Parents agreed with the decision for S.F. to remain on homebound. (T. of Todd, Tr. Vol. 2, p. 309; T. of Lasher, Tr. Vol. 4, pp. 748-749; Stip. Ex. S105). The Parents reported that homebound was going well, except for math. (T. of Father, Tr. Vol. 3, p. 631; Stip. Ex. S104).

64. At the November 8 IEP meeting, it was made clear to the Parents that transfer to the LC program at Piedmont High School was an option available to them. (T. of Thomson, Tr. Vol. 3, p. 524; T. of Lasher, Tr. Vol. 4, p. 749; Stip. Ex. S104).

65. Although the Parents requested that UCPS provide an "out of the box" placement for S.F., the Parents did not define or describe what was meant by out of the box other than a request for small class sizes and "something different." (T. of Todd, Tr. Vol. 2, p. 323-324; T. of Father, Tr. Vol. 3, p. 575; Stip. Ex. S104).

66. Following the November 8 IEP meeting, the Parents mailed to MRHS a ten (10) day notice of their intent to place S.F. in private school at public expense. (T. of Father, Tr. Vol. 3, pp. 631-632).

67. On November 24, 2021, Lasher sent a letter to the Parents and requested additional information regarding the private school placement and any recommendations from professionals regarding the need for private school. The Parents never responded to this letter. (T. of Father, Tr. Vol. 3, p. 633; Lasher, Tr. Vol. 4, p. 750; Stip. Ex. S137).

68. UCPS attempted to hold an IEP meeting within ten (10) school days of the 10-day notice from the Parents and scheduled an IEP meeting for November 30, 2021. The Parents were unable to attend the November 30 meeting. (T. of Father, Tr. Vol. 3, p. 633; Stip. Exs. S137 and S141).

69. An IEP meeting was scheduled for December 6, 2021 at 12 p.m. UCPS provided the Parents an agenda prior to the meeting, which included discussion of the need for

evaluations, review of the continuum of services/placement and discussion of the implementation of the IEP. (Stip. Ex. S140).

70. Prior to the December 6, 2021 IEP meeting, the Parents informed UCPS they would have to leave the 12 p.m. meeting by 1:30 p.m. (T. of Father, Tr. Vol. 3, pp. 633-634; Stip. Ex. S141). By the December 6, 2021 IEP meeting the Parents knew they were going to withdraw S.F. from UCPS. (T. of Father, Tr. Vol. 3, pp. 631-632).

71. EC Director Dr. Laura Beachum ("Beachum") requested the district autism specialist, Stephanie Welland ("Welland") draft a re-entry plan and attend the December 6 IEP meeting to present and explain the plan. (T. of Beachum, Tr. Vol. 3, pp. 669-670). The re-entry plan proposed that S.F. transition back into the school setting from his homebound placement for one period at a time until he was able to successfully attend school without exhibiting aggressive behaviors. (Stip. Ex. S111).

72. A re-entry plan is not required by IDEA; however, it is best practice to assist a student who has been out of school for a lengthy time period to transition back into the school setting on a full-time basis. (T. of Beachum, Tr. Vol. 3, p. 670).

73. The Parents did not agree with the draft re-entry plan that was proposed at the meeting on December 6, 2021. (T. of Welland, Tr. Vol. 5, pp. 832-833; Stip. Exs. S106 & S107).

74. Because of Parent concerns regarding S.F. returning to large general education classrooms without support, the team also discussed the possibility of adult support in the classroom but did not decide to provide adult support because of concern it could trigger S.F.'s behaviors. (T. of Poulsen, Tr. Vol. 2, pp. 399-400; T. of Todd, Tr. Vol. 2, p. 314; Stip. Ex. S107).

75. The IEP team rejected the Parents' request for private school placement that provided for smaller class sizes but did not address S.F.'s EC needs. (T. Poulsen, Tr. Vol. 2, pp. 401-402; Stip. Ex. S107).

76. The team was unable to complete the IEP on December 6 because of the Parents' time constraints and scheduled another IEP meeting for December 9. (T. of Beachum, Tr. Vol. 3, pp. 664-665; Stip. Ex. S107 & S141). The Parents cancelled the December 9 IEP meeting because of family illness. (T. of Father, Tr. Vol. 3, p. 634-635; Stip. Ex. S141).

77. Beachum wrote the Parents a letter on December 8, 2021 regarding their request to reschedule the IEP meeting and stated that another meeting would be scheduled as soon as possible to address their concerns. Beachum reiterated the request that Parents provide information regarding their private school. (T. of Beachum, Tr. Vol. 3, pp. 664-665; Stip. Ex. S141).

78. On December 10, UCPS received notice of S.F.'s withdrawal from UCPS. (Stip. Ex. S142). Prior to his withdrawal, S.F. was on track to pass his courses for the first semester. (T. of Lasher, Vol. 4, p. 770; Stip. Ex. S161).

79. The IEP meeting was rescheduled for December 16, 2021. Welland presented a revised re-entry plan that provided for S.F. to remain in the LC classroom, with smaller class sizes, until he was ready to transition to his general education classes. (T. of Welland, Tr. Vol. 5, pp. 833-834; Stip. Ex. S112).

80. The Father rejected the revised re-entry plan because S.F. would spend additional time in the LC classroom with its smaller class sizes. The Father remarked that now the class sizes were "too small." (T. of Poulsen, Tr. Vol. 2, pp. 404-405; Stip. Ex. S108).

81. At the December 16 IEP meeting, the IEP team updated S.F.'s present levels of performance and annual goals, added additional goals for verbal and physical aggression, and added a goal for understanding social reciprocity. (Stip. Exs. S109 & S110).

82. The December 16 IEP increased S.F.'s services for social-emotional skills to 75 minutes, 20 times per week and included specially designed instruction in writing for 15 minutes, 5 times per week. The implementation date of the IEP was the beginning of the second semester on January 19, 2022. (T. of Poulsen, Tr. Vol. 2, pp.409-410; Stip. Ex. S109).

83. The frequency of 20 times per week for specially designed instruction for social-emotional skills reflected use of the re-entry plan and the frequency would decrease throughout the semester as S.F. moved through the stages of the plan. (T. of Beachum, Tr. Vol. 3, p. 667-668).

84. The December 16 IEP also added counseling as a related service for 15 minutes, 2 times per week. The IEP team also reviewed the BIP and determined it would be updated following completion of the FBA. (T. of Poulsen, Tr. Vol. 2, p. 411; Stip. Ex. S110).

85. At the December 16 meeting, a reevaluation was opened to conduct the FBA. The team also requested consent to conduct a sensory processing evaluation and a speech language evaluation, including pragmatics, needed to continue S.F.'s eligibility under the category of autism spectrum disorder. (T. of Poulsen, Tr. Vol. 2, pp. 407-409; Stip. Ex. S110).

86. The IEP proposed on December 16 could have been implemented at several school locations including MRHS, the LC program at Piedmont High School and at S.F.'s home school, Cuthbertson High School. (T. of Beachum, Tr. Vol. 3, pp. 668-669).

87. The IEP proposed on December 16, 2021 provided FAPE to S.F. (T. of Beachum, Tr. Vol. 4, p. 815).

18

88. The Parents rejected the December 16, 2021 IEP, in part, because S.F. was already enrolled in private school. (T. of Father, Tr. Vol. 3, pp. 573 & 599).

**Spring Semester of 2021-2022 School Year**

89. S.F. enrolled and attended Trinity Preparatory Christian School in Charlotte, NC. ("Trinity Prep"). The Parents selected the private school because of its smaller class sizes. (Stip. Ex. S107). S.F. did not receive any EC services at Trinity Prep. (Stip. Ex. S149).

90. In January of 2022, the Parents signed consents for UCPS to complete evaluations. The Parents refused to allow UCPS to observe S.F. at Trinity Prep to conduct observations necessary for completion of the FBA. (T. of Poulsen, Tr. Vol. 2, p. 417; T. of Father, Tr. Vol. 3, p. 641).

91. Although class sizes were smaller at Trinity Prep, S.F. had disciplinary incidents involving physical aggression. (T. of Father, Tr. Vol. 3, p. 643; T. of Lambert, Tr. Vol. 2, pp. 222-223). Effective February 8, 2022, S.F. was prohibited from attending Trinity Prep in person because of the disciplinary incidents. (T. of Lambert, Tr. Vol. 2, p. 229-230; Stip. Ex. S167).

92. On March 28, 2022, the Parents filed the Petition for a Contested Case Hearing. The "Requested Relief" in the Petition included prospective private school placement for S.F. for the remainder of his educational career, payment for private counseling services, and payment for private compensatory education services.

93. On March 31, 2022, UCPS held an IEP meeting with a facilitator provided by the North Carolina Department of Public Instruction ("NCDPI"). (Stip. Ex. S151).

94. On the morning of the IEP meeting, the Parents provided UCPS a lengthy list of concerns and requested placement at various private schools, including a request for placement at Melmark Carolinas. (T. of Beachum, Tr. Vol. 3, p. 676; Stip. Ex. S47).

95. At the March 31 IEP meeting, the Parents did not inform UCPS that S.F. was no longer attending Trinity Prep in person. (T. of Father, Tr. Vol. 3, p. 641; T. of Poulsen, Tr. Vol. 2, p. 423; Stip. Ex. S149).

96. The March 31, 2022 IEP did not provide for a re-entry plan because UCPS believed that S.F. was attending school in person at Trinity Prep and therefore did not need a plan to transition S.F. back into the school setting. (T. of Beachum, Tr. Vol. 3, p. 671).

97. Representatives from MRHS, Cuthbertson High School and Piedmont High School attended the IEP meeting on March 31 to discuss programming options currently available at the respective schools. (Stip. Ex. S152).

98. The March 31, 2022 Proposed IEP provided the following Specially Designed Instruction: 75 minutes of Social/Emotional Skills, 5 times per week and 15 minutes of Writing, 5 times per week. The Proposed IEP also provided related services of Counseling for 30 minutes, 2 times per week, and special transportation to provide access to the Learning Connections Program. (Stip. Ex. S151).

99. The March 31, 2022 Proposed IEP provided the following accommodations: adult supervision, use of headphones and the use of a "cool down area" or "safe space" when feeling frustrated or as need for self-regulation. (T. of Poulsen, Tr. Vol. 2, p.420-421; Stip. Ex. S151).

100. At the March 31 meeting, the team discussed the qualifications of the person who would provide the adult support and the training that would be provided to the individuals. (T. of Beachum, Tr. Vol. 3, p. 672; Stip. Ex. S152).

101. The Assistant Principal at Piedmont High School Mari McTamney ("McTamney") provided information to the Parents about the LC program at Piedmont High School and invited the parents to tour the school. The Parents did not take a tour of Piedmont High School. (T. of McTamney, Tr. Vol. 4, p. 778).

102. McTamney informed the Parents of various options for students to receive general education instruction while in the LC classroom. (T. of McTamney, Tr. Vol. 4, pp. 783-784).

103. Although the Proposed IEP could be implemented at several different schools, the IEP team stated the LC Program at Piedmont HS was the "most appropriate placement" because it would provide S.F.'s EC services and address the Parents' concerns regarding smaller class sizes. (T. of Beachum, Tr. Vol. 3, pp. 663-664; Stip. Ex. S152).

104. The March 31, 2022 Proposed IEP provided an offer of FAPE. (T. of Poulsen, Tr. Vol. 2, p. 356; T. of Beachum; Tr. Vol. 3, pp. 661).

105. The Parents rejected the March 31, 2022 offer of FAPE because it required S.F. to attend a public school. (T. of Poulsen, Tr. Vol. 2, p. 421-422). At a subsequent April 12 IEP meeting, the Parents stated they were "not willing to take the risk of public school." (T. of McTamney, Tr. Vol. 4, p. 781; Stip. Ex. S154).

106. The Parents also rejected placement in the LC program at Piedmont High School because there is another student there that S.F. does not see "eye to eye" with, although this reason for rejection was mentioned for the first time at the Hearing and not in any previous IEP meeting. (T. of Father, Tr. Vol. 3, pp. 616-617, 652).

107. The Parents expressed concern that placement at UCPS will result in continued behavioral instances with the possibility of suspension and criminal charges, and under these circumstances, UCPS could not provide a successful educational program

to S.F. (T. of Father, Tr. Vol. 3, p. 643-644). The Parents were also concerned about S.F. attending any school that has a school resource officer. (T. of McTamney, Tr. Vol. 4, p. 782; Stip. Ex. S154).

108. Because UCPS did not have the opportunity to review the Parents' list of concerns and requested private schools at the March 31 meeting, another IEP meeting was scheduled for April 12, 2022. (T. of Beachum, Tr. Vol. 3, p. 676).

109. Prior to the April 12, 2022 meeting, Beachum researched the Parents' requested private schools. Beachum determined the placement proposed by UCPS was appropriate and there was no need for extensive discussion regarding the Parents' private school requests. (T. of Beachum, Tr. Vol. 3, p. 676-677).

110. UCPS completed the sensory processing and speech language evaluations necessary to establish S.F.'s eligibility for services upon his re-enrollment and return to an in-school setting. (T. of Poulsen, Tr. Vol. 2, p. 359; T. of Father, Tr. Vol. 3, p.610; Stip. Ex. S157).

111. UCPS contracted with outside providers to complete S.F.'s FBA. (T. of Poulsen, Tr. Vol. 2, p. 379; Stip. Ex. S149). Although not best practice, UCPS agreed to complete the FBA based upon rating scales completed by S.F.'s Trinity Prep teachers. At the April 12 meeting the Parents agreed to have Trinity Prep teachers complete rating scales and return those to UCPS by April 30, 2022. (Stip. Ex. S156). The Parents did not return the rating scales to UCPS by April 30, 2022. (T. of Beachum, Tr. Vol. 3, p. 681).

**Prospective Private School Placement**

112. The Parents have looked at multiple private school options and have requested placement at Melmark Carolinas ("Melmark"). (T. of Father, Tr. Vol. 3, p. 613).

113. The Parents requested private school placement because they believe there is a "better chance" of S.F. being successful in a private school than in UCPS. (T. of Father, Tr. Vol. 3, p. 626).

114. For the 2022-2023 school year, Melmark has 22 students enrolled. (Tr. of Stevenson, Tr. Vol. 1, p. 141). Most students at Melmark do not perform academically at grade level. (*Id*. at p. 142). There are no non-disabled students at Melmark. (*Id*. at p. 148).

115. It has not been determined whether S.F. meets eligibility requirements to attend Melmark. (Tr. of Stevenson, Tr. Vol. 1, p. 144). Melmark does not employ general education teachers and it would be a "big hurdle" to provide general education classes to S.F. if he attended Melmark. (*Id*. at 150-151).

116. Melmark is not an appropriate placement for S.F., who has an above average I.Q., is college-bound, and would not be successful in an environment with developmentally

delayed students.  (T. of Todd, Tr. Vol., p. 315; T. of Beachum, Tr. Vol. 3, pp. 677-678).

**Private Counseling Services**

117. S.F. has had no private counseling services since COVID began, which is outside of the relevant time period of this case.  (T. of Father, Tr. Vol. 3, p. 637).

**Private Compensatory Education Services**

118. UCPS provided compensatory education services to S.F. to address delays in EC services provided during the Fall semester of the 2021-2022 school year.  (Stip. w).

119. There was no evidence presented demonstrating S.F.'s need for compensatory services beyond those already provided by UCPS.

120. Trinity Prep was not an appropriate private placement for S.F.  (*Order Granting Respondent's Motion for Partial Summary Judgment*, June 28, 2022).

**Evidence of FAPE Violations**

121. No evidence was presented of S.F.'s regression or lost academic gains over extended breaks from school that would support a need for ESY.

122. No evidence was presented that failure to have a regular education teacher at IEP meetings caused a deprivation of educational benefit.

123. No expert testimony was offered that the IEPs presented by UCPS failed to provide FAPE.

124. No expert testimony was offered that S.F. requires a private school placement or smaller class sizes to receive FAPE.

**BASED UPON** the foregoing Findings of Fact, the Undersigned makes the following:

## CONCLUSIONS OF LAW

**General Legal Framework**

1. To the extent the Findings of Fact contain conclusions of law, or that the Conclusions of Law are findings of fact, they should be considered without regard to their given labels.

2. This Order incorporates and reaffirms the Conclusions of Law contained in the previous Orders entered in this litigation.

3. In any action brought against a local board of education, the action of the board "shall be presumed to be correct and the burden of proof shall be on the complaining party to show the contrary."  N.C. Gen. Stat. § 115C-44(b).

4. As the party requesting the hearing, the burden of proof lies with Petitioners and the standard of proof is by a preponderance of the evidence.  *See Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 62 (2005).

5. The Petitioners, as the party requesting the hearing, may not raise issues at the hearing that were not raised in the due process petition unless the other party agrees otherwise. 20 U.S.C. § 1415(f)(3)(B); N.C. Gen. Stat. § 115C-109.6(b).

6. The trier of fact has sole judgment of the credibility of witnesses and weight to be given to the testimony and whether it is consistent with other believable evidence that has been presented in this case.  *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2D. 362, 365 (2000) ("It is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony.")

## Judicial Review of Free Appropriate Public Education ("FAPE")

7. Whether a student with a disability is afforded a "free appropriate public education" pursuant to an IEP is a two-fold inquiry:  (1) whether the State has complied with the procedures set forth in the Individuals with Disabilities Education Act ("IDEA"), *Hendrick v. Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982); and (2) whether the IEP developed through those procedures is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 999, 1001 (2017).  Thus, to prevail, Petitioners must demonstrate by a preponderance of the evidence the school district failed under both prongs of the test.

8. A student with a disability is afforded a "free appropriate public education" when a child's education program is "appropriately ambitious in light of his circumstances." *Endrew*, 137 S. Ct. at 1000.

9. "Congress did not intend that every special education program necessary to maximize each handicapped child's potential be provided."  *Burke Cty. Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990) (citing *Rowley*, 458 U.S. at 199).  Thus, "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal."  *Endrew*, 137 S. Ct. at 999 (citing *Rowley*, 458 U.S. at 206-207).

10. North Carolina's standard for education does not mean the school system must provide the "best" program or a "utopian" program.  Instead, the standard means the IEP must "ensur[e] that the child has an opportunity to reach their full potential commensurate with the opportunity given other children."  *Burke Co. Bd. of Educ. v.*

*Denton,* 895 F.2d 973, 983 (4th Cir. 1990). Thus, disabled students in North Carolina are not entitled to a "utopian" program any more than regular education students. *Harrell v. Wilson Co. Schs.,* 58 N.C. App. 260, 265 (1982) *cert. denied,* 460 N.C. 1012 (1983). According to the North Carolina Supreme Court, all students are entitled to the opportunity of a sound basic education. *Leandro v. State,* 346 N.C. 336, 345 (1997).

11. In matters alleging a procedural violation of the IDEA, the Court may rule that such a procedural violation results in a denial of FAPE in three circumstances: when the procedural deficiency (1) impeded the child's right to FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE; or (3) caused a deprivation of education benefit. 20 U.S.C. § 1415(f)(3)(E)(ii).

12. Furthermore, the Fourth Circuit Court of Appeals has clarified: "to the extent that the procedural violations did not actually interfere with the provision of a free appropriate education, these violations are not sufficient to support a finding that an agency failed to provide a free appropriate education." *Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997); *see also Singletary v. Dep't. of Health and Human Servs.*, 502 Fed. Appx. 340, 342, (4th Cir. 2013) (unpublished) (holding that "a procedural violation will not support a cognizable claim . . . unless the parent can show the procedural violation actually interfered with the child's FAPE.").

13. A parent or private provider's recommendation that a small class size may help a student with a disability does not render that accommodation necessary for a FAPE. *See Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 434 (3d Cir. 2013) (holding smaller class size was not necessary to ensure student received meaningful educational benefit simply because smaller classes might have helped student learn more easily); *Dirocco ex rel. M.D. v. Board of Educ. of Beacon City School Dist.*, 2013 U.S. Dist. LEXIS 434 (S.D.N.Y. Jan. 2, 2013) ("That the size of the integrated classes in which [M.D.] was offered a placement was larger than his parents desired does not mean that the placement was not reasonably calculated to provide educational benefits.") (*quoting M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 869 F.Supp.2d 320, 335) (E.D.N.Y. 2012)).

14. The methodology to be employed by a school system in educating a child eligible under IDEA is within the sole province of the school system's professional educators and is free from judicial interference. *Rowley*, 458 U.S. 176, 207 (1982); *Hartmann v. Loudoun Cty. Bd. Of Educ.*, 118 F. 3d 996, 1000-01 (4th Cir. 1997); *Barnett v. Fairfax Co. Sch. Bd.*, 927 F. 2d 146, 151-52 (4th Cir. 1991). Therefore, appropriate IEPs should not be disturbed due to a disagreement with the content or methodology, and courts should defer to the educator's decisions. *Rowley*, 458 U.S. at 207-08.

15. Reviewing courts should be reluctant to second-guess the specialized knowledge and experience of educational professionals. *Rowley*, 458 U.S. at 206-08; *Endrew,* 137 S. Ct. at 1001. "[D]eference is based on the application of expertise and the exercise of judgment by school authorities. The [IDEA] vests these officials with responsibility

for decisions of critical importance to the life of a disabled child." *Endrew*, 137 S. Ct. at 1001.

## Evaluations

16. "Each local educational agency shall ensure that . . . the child is assessed in all areas of suspected disability . . . ." 20 U.S.C. § 1414(b)(3)(B).

## Placement and Least Restrictive Environment

17. The IDEA prescribes educating children with disabilities with their non-disabled peers to "the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). What is "appropriate" is based on the child's particular circumstances. *Endrew*, 137 S. Ct. at 999.

## Functional Behavioral Assessment ("FBA") and Behavioral Intervention Plan ("BIP")

18. If an IEP team determines a student's conduct that gave rise to a change in placement was a manifestation of the student's disability, the IEP team must conduct a functional behavioral assessment ("FBA"), unless the school district conducted such assessment prior to the conduct at issue. 34 C.F.R. 300.530(f)(1).

19. Also, the IEP team must implement a behavioral intervention plan ("BIP") for the student, unless a BIP has already been developed. *Id.* If a BIP already was developed, the IEP team must review the plan and modify it as necessary to address the student's behavior. *Id.*

20. Even if a BIP is not perfectly executed, procedural inadequacies do not automatically amount to a denial of FAPE. *See School Bd. of Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007 (8th Cir. 2006).

21. A "functional behavioral assessment" ("FBA") is a tool used to address a child whose behavior interferes with his ability or the ability of others to learn in the educational environment. While the IEP team must consider the child's need for the use of positive behavioral interventions and supports under 34 C.F.R. 300.324 (a)(2)(i), and an FBA may help the IEP team address behavioral issues, the IDEA does not require the IEP team to conduct an FBA to meet this requirement. 71 Fed. Reg. 46,683 (2006); *see also W.S. and K.M. v. Nyack Union Free Sch. Dist.*, 56 IDELR 210 (S.D.N.Y. 2011) (observing that the lack of an FBA does not render an IEP procedurally inadequate; the IDEA requires only that the IEP team consider behavior interventions and strategies).

22. The only time a "functional behavioral assessment" is mentioned in the law is in relation to school personnel's authority to remove a child from their educational placement for disciplinary reasons. *See* 34 C.F.R. 300.530(f)(1). In relation to such action, if the conduct subject to discipline was the result of a child's manifestation of

disability, a functional behavior assessment should be conducted unless the school district had conducted a functional behavioral assessment prior to the behavior. *Id.*

23. The Fourth Circuit has held "it would be improper" to hold a school district liable for a procedural violation "when that failure was the result of [the parents'] lack of cooperation." *M.M. ex. rel. D.M. v. Sch. Dist. Of Greenville County*, 303 F.3d 523, 535 (4th Cir. 2002).

**Individualized Education Program ("IEP")**

24. An IEP is a written document that must include a statement of: (1) the child's present levels of academic achievement and functional performance; (2) measurable, annual goals; (3) how and when the child's progress toward meeting annual goals will be measured; (4) special education and related services and supplementary aids and services; (5) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class; (6) any individual appropriate accommodations for State and districtwide assessments; (7) the projected start date, frequency location, and duration for services and modifications. 34 C.F.R. 300.320(a).

25. An appropriate IEP must do the following: (1) indicate the student's current level of academic achievement and functional performance; (2) describe how the child's disability affects his involvement and progress in the general education curriculum; (3) state annual goals; (4) provide a method for progress monitoring; and (5) identify special education and related services for the student. *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(A)).

**Related Services**

26. "Related services means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26).

27. The IDEA ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Walczak v. Florida Union Sch. Dist.,* 142 F.3d 119, 132 (2d Cir. 1998).

28. "To require . . . the furnishing of every special service necessary to maximize each handicapped child's potential is . . . further than Congress intended to go." *Bd. of Educ. v. Rowley,* 458 U.S. 176, 199 (1982).

**Placement Following Manifestation Determination Review ("MDR")**

29. IDEA requires a manifestation determination review within ten (10) school days of any decision to change the placement of a child with a disability because of a violation of the student code of conduct. 34 C.F.R. 300.530(e).

30. If the MDR team finds the behavior was a manifestation of the student's disability, the student must be returned to the placement from which he was removed unless the parent and district agree to a change in placement as part of its modification of the student's behavioral intervention plan. 34 C.F.R. 300.530(f)(2).

## **Homebound Services**

31. When a disabled student is removed from their current placement pursuant to federal regulations, the student must "[c]ontinue to receive educational services . . . so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP[.]" 34 C.F.R. 300.530(d)(1)(i).

32. The student's IEP team determines appropriate services to provide in the new placement. *Id.* at 300.530(d)(5).

33. A school district is not required to replicate all services and instruction a student would receive if in school. *Dept. of Education, State of Hawaii*, 115 LRP 53315 (E.D. HI 2015).

## **Transition Plans**

34. A "transition plan" is not required in an IEP, except in the specific circumstances related to a student's preparations for post-secondary life. 34 C.F.R. 300.320 states:
> (b) Transition services. Beginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team, and updated annually, thereafter, the IEP must include—
> > (1) Appropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills; and
> > (2) The transition services (including courses of study) needed to assist the child in reaching those goals. 34 C.F.R. 300.320 (emphasis added).

35. "[T]here is no requirement in the IDEA for a 'transition plan' when a student moves from one school to another." *E. Z.-L. ex rel. R.L. v. New York City Dep't of Educ.*, 763 F. Supp. 2d 584, 598 (S.D.N.Y. 2011), *aff'd sub nom., R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012).

36. Even when a student's unique needs suggest a transition plan should be provided, reviewing tribunals and courts have been reluctant to find a substantive denial of FAPE on that basis. *See Lee's Summit R-VII School District*, 110 LRP 9423 (Mo. SEA 2010) ("While a plan is technically not mandated under IDEA in these circumstances, we recognize a formal transition plan would have provided a great deal of comfort for the Parents …. Our job, however, is not to write into IDEA what might be beneficial – that determination is for legislators[.]"); *In re: Student with a Disability*, 110 LRP 49313 (NY SEA 2010) (noting that "although transition services were not identified on the

student's IEP, the hearing record shows that the proposed school would have been responsive in addressing any transition needs related to the student's enrollment at the public school").

## Extended School Year ("ESY")

37. "Extended school year services" ("ESY") means special education and related services that are provided to a disabled student beyond the normal school year and in accordance with the student's IEP.  34 C.F.R. 300.106(b).

38. ESY services are provided on an individualized basis only if an IEP team determines special education and related services are necessary outside of the normal school year to provide a disabled student a free and appropriate public education.  *Id.* at 300.106(a).

39. The Fourth Circuit has determined ESY services are necessary to a free and appropriate public education when a disabled student's gains during the normal school year would be "significantly jeopardized" if the student is not provided an educational program during summer.  *M.M. v. Sch. Dist.,* 303 F.3d 523, 537-38 (4th Cir. 2002).


## Private Placement

40. Petitioners have the burden of proving the school district denied the child a free appropriate public education prior to withdrawal and the parent's proposed placement is appropriate.  *School Co. of the Town of Burlington, Mass. v. Dep't of Educ. of the Commonwealth of Mass.*, 471 U.S. 359, 370 (1985).

41. "The IDEA was not intended to fund private school tuition for the children of parents who have not first given the public school a good faith opportunity to meet its obligations." *Rockwall Indep. Sch. Dist. v. M.C.*, 816 F.3d 329, 339-40 (5th Cir. 2016).

42. Although the IDEA provides parents with an opportunity for meaningful input, this "right to provide meaningful input is simply not the right to dictate an outcome[.]" *Id.* at 339.

43. The Petitioners have failed to carry their burden of presenting sufficient evidence that Respondent denied S.F. a free and appropriate public education ("FAPE") at any time during the 2021-2022 school year.

44. The Petitioners have failed to carry their burden of presenting sufficient evidence that Respondent denied S.F. a FAPE with regard to its evaluations, placement or educational services provided to S.F. during the time period relevant to this Petition.

45. The Petitioners have failed to meet their burden to prove that any alleged procedural violations caused educational harm to S.F. as a "child with a disability."

28

46. The Petitioners have failed to meet their burden to prove Melmark Carolinas is an appropriate placement for S.F.

47. The Petitioners have failed to meet their burden to prove private school placement is required for S.F. to receive a FAPE.

48. The Petitioners have failed to meet their burden to prove an award for private counseling is appropriate.

49. The Petitioners have failed to meet their burden to prove an award of private compensatory education is appropriate.

## **FINAL DECISION**

BASED upon the foregoing FINDINGS OF FACT and CONCLUSIONS OF LAW, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Petitioners are not entitled to any relief in this matter, Respondent is the prevailing party on all issues, and therefore, the relief requested in the Petition for Contested Case Hearing is hereby DENIED.

## **NOTICE OF APPEAL RIGHTS**

In accordance with the Individuals with Disabilities Education Act and North Carolina's Education of Children with Disabilities laws, the parties have appeal rights regarding this Final Decision.

**Any party aggrieved by the findings and decision of a hearing officer may under N.C. Gen. Stat. § 115C-109.6 institute a civil action in State court within thirty (30) days after receipt of the notice of the decision or under 20 U.S.C. § 1415 a civil action in federal court within ninety (90) days after receipt of the notice of the decision.**

Unless appealed to State or federal court, the State Board shall enforce the final decision of the administrative law judge.

**IT IS SO ORDERED.**

This the 5th day of December, 2022.

David F Sutton
Administrative Law Judge

<u>**CERTIFICATE OF SERVICE**</u>

       The undersigned certifies that, on the date shown below, the Office of Administrative Hearings sent the foregoing document to the persons named below at the addresses shown below, by electronic service as defined in 26 NCAC 03 .0501(4), or by placing a copy thereof, enclosed in a wrapper addressed to the person to be served, into the custody of the North Carolina Mail Service Center who subsequently will place the foregoing document into an official depository of the United States Postal Service.

Carla Marie Fassbender
The Law Offices of Keith L. Howard, PLLC
carlaf@khowardlaw.com
       Attorney for Petitioner

Kelli Lorraine Espaillat
Kincaid and Associates, PLLC
kespaillat@kincaidandassociates.com
       Attorney for Petitioner

Ashley Frances Leonard
Campbell Shatley PLLC
ashley@csedlaw.com
       Attorney for Respondent

Cynthia S. Lopez
Campbell Shatley, PLLC
Cynthia@csedlaw.com
       Attorney for Respondent

Teresa Silver King
NC Department of Public Instruction
due_process@dpi.nc.gov
       Affiliated Agency

       This the 5th day of December, 2022.

*VTsuprenko*

Viktoriya Tsuprenko
Paralegal
N. C. Office of Administrative Hearings
1711 New Hope Church Road
Raleigh, NC 27609-6285
Phone: 984-236-1850